IN RE ESTATE OF J. W. CUYKENDALL.

JANUS PETERSEN, Appellant, v. MAX EMMERT, Administrator, Appellee.

No. 43642.

May 4, 1937.

Swan, Martin & Martin and Ralph Cockshoot, for appellant.

William Ritchie, J. M. Emmert, and Boorman & Whitmore, for appellee.

DONEGAN, J.—During his lifetime, J. W. Cuykendall lived in the city of Atlantic, Iowa. His residence was situated toward the outskirts of the city and was surrounded by a considerable tract of land. Approximately 160 feet southwest of the residence there was a two-story garage, on the ground floor of which automobiles were stored, and in the second story of which living quarters were located. At the time here involved these living quarters were occupied by Cuykendall's chauffeur, Janus Petersen, and his family. A driveway, which entered the grounds from the west side of Chestnut street, went along the south side of the house and then, in a slightly southwesterly direction, to the garage. There was a large porch that extended across the east, or front end of the house, and also for some distance to the west along the south side thereof. At the west end of this porch, as it extended along the south side of the house, steps entered the porch from the driveway, and a roof, extending from the porch over the driveway, formed a porte-cochere. On the evening of September 16, 1928, the chauffeur, Janus Petersen, went to the Rock Island railway station to meet Mrs. Cuykendall, who was returning to Atlantic on a train arriving about 8:30 o'clock, and took her to the Cuykendall home. The chauffeur, Petersen, let Mrs. Cuykendall out of the automobile under the porte-cochere and placed her luggage on the porch. He then proceeded to the garage, where he left the automobile, and returned to the place where he had left the luggage. At this point he was met by Mrs. Cuykendall, who told him that Mr. Cuyken-

dall had a revolver and was threatening to shoot both her and Petersen, and asked him to call the police. Petersen hastened back to the garage for the purpose of telephoning to the police, and had passed to the inside of and was in the act of closing a door on the east side of and near the southeast corner of the garage, which opened onto a stairway to his living quarters, when he heard a shot and was showered with glass from the top part of this door. He then went upstairs and called the police, who arrived in a few minutes and had some conversation with Petersen and with Mrs. Cuykendall. The police were told what had happened and requested to go into the house and get the revolver from Mr. Cuykendall, but refused to do so without a warrant. After some talk the police left, and sometime later Petersen went into the house and proceeded upstairs therein and into Mr. Cuykendall's room and obtained the revolver. Nothing further of any special importance occurred that night, but, on the following morning, Mr. and Mrs. Petersen were requested to go to the Cuykendall residence and there met Mr. and Mrs. Cuykendall and a servant named Minnie Paulsen in the library. After some reference had been made to the occurrences of the night before, Mr. Cuykendall stated that he intended to lay both Mrs. Cuykendall and Petersen out, and Mrs. Cuykendall then stated, in substance, that Cuykendall should pay Petersen damages, and that he should pay $15,000. Petersen stated he would take $10,000, and Mr. Cuykendall then said that was too much, but that he would be paid $6,000, to be paid after Cuykendall's death, and Petersen said that would be all right. Cuykendall then said in substance: "Then it is agreed that nothing is to be said about this from now on," and Petersen answered, "All right."

Following these occurrences, Petersen remained in the employ of Cuykendall as chauffeur, yardman and general handy man until the death of Mrs. Cuykendall in 1933, and thereafter he continued in the same employment, but, in addition to his other duties, performed the duties of a nurse and attendant for Mr. Cuykendall until Cuykendall's death in February, 1935. Administration was taken out upon Mr. Cuykendall's estate and, on July 10, 1935, Petersen filed a claim against the estate in two counts. As the only question presented on this appeal arises out of the claim for $6,000, on the contract alleged in the

first count, it is unnecessary to devote any attention to the other count of said claim.

On the trial of the case evidence was introduced in behalf of the claimant which tended to support the facts substantially as set out above. At the close of the claimant's evidence the defendant administrator moved the court for a directed verdict on division one of plaintiff's claim, "for the reason that the evidence clearly shows that part of the consideration and apparently a major part was that the claimant and his wife should conceal the commission of an alleged crime, which the claimant alleges was committed by the deceased. And that therefore a part of the consideration upon which the claim set forth in division one of plaintiff's petition was founded, is against public policy and illegal and therefore the contract itself illegal and unenforceable and void." This motion was sustained by the trial court and, pursuant to the court's order, the jury returned a verdict in favor of the defendant, and judgment was entered thereon. From this order and judgment the claimant appeals.

As above stated, only one question is presented by this appeal—did the trial court err in directing the jury to return a verdict against the claimant on count one of his claim? Appellant contends that there is nothing in the evidence, as to the terms of the contract on which his claim is based, that justifies the holding of the trial court that there was any agreement "that the claimant and his wife should conceal the commission of an alleged crime, which the claimant alleges, was committed by the deceased." With this contention of the appellant we are disposed to agree. It is a well-established rule of law, for which citation of authority is unnecessary, that, in considering a motion for a directed verdict, the evidence in behalf of the party against whom the verdict is sought to be directed, and all reasonable inferences therefrom, must be accepted as true. It must, therefore, be accepted as true that, at the time this motion for a directed verdict was before the court for ruling thereon, the evidence in behalf of the claimant tended to show that an assault had been made upon claimant by Cuykendall on the evening of September 16, 1928, and that Cuykendall had agreed that $6,000 would be paid to claimant after Cuykendall's death. It is elementary, of course, that it is not necessary, in order to establish an assault, to show that there was also a battery, or that the person assaulted suffered any particular bodily injury as the

result of such assault. It is also elementary that one upon whom an unjustified assault is made has a civil cause of action for damages against the person making the assault. What is there in the evidence to show that the agreement made on the morning following the assault was not an agreement in settlement of this civil cause of action that the claimant had against the deceased for the unjustified assault, instead of an agreement to conceal the commission of a crime?

Minnie Norgaard (formerly Minnie Paulsen) stated that, in the conference in the library on the morning following the shooting, ''I heard Mrs. Cuykendall say that he (Mr. Cuykendall) should make some kind of settlement with John Petersen about this shooting affair the night before.'' Mrs. Petersen testified that ''Mr. Cuykendall said he intended to lay both Mrs. Cuykendall and my husband out, and Mrs. Cuykendall said he should pay us damages.'' Thus far, we see nothing in the conversations from which it could be said by the court, as a matter of law, that the parties were discussing the crime involved in the proceedings of the night before, or that the claimant was demanding any sum of money as a condition for his not prosecuting a criminal action against the deceased. On the contrary, the statement made by Mrs. Cuykendall, that the deceased should pay Petersen damages, would tend to negative the thought that the agreement being negotiated was in regard to compounding or agreeing not to prosecute any crime or offense which had been committed by decedent. The only evidence in regard to there being any agreement not to talk about the matter is found in the testimony of Mrs. Petersen. After Cuykendall had made the proposition that he would pay Peterson $6,000, to be paid after Cuykendall's death, and after Petersen had said that this would be all right, her testimony proceeds as follows: ''I remember Mr. Cuykendall saying, then it is agreed nothing is to be said about this from now on. I did not say anything, and Janus said all right. I did not hear anything more said. * * * We did not talk about prosecuting Mr. Cuykendall, and I did not say anything about it.

''Q. But he did not want it talked about, did he? A. Well, he did not want it to be gossiped about.

''Q. And he told you that? A. He told us.

"Q. You both agreed to keep quiet about it, did you? A. Naturally we would, but I didn't say anything."

In the case of Cotten v. Halverson, 201 Iowa 636, 638, 207 N. W. 795, 797, which was an action to foreclose a mortgage, it was claimed that a part of the consideration for said mortgage was an agreement for the purpose of compounding or concealing a felony or not to prosecute the same or not to give evidence thereof, and that the consideration for the mortgage was, therefore, invalid. In that case, Mr. Justice Albert, after setting out sections 13168, 13169, and 13757 of the Code of 1924, which are the same as the same numbered sections in subsequent Codes, and after stating that these were the only sections under which the claimed invalidity of the mortgage could be based, proceeded to state:

"An analysis of these three sections shows that, to make any one of them operative, there must be an agreement or understanding, expressed or implied, (1) to compound or conceal such offense, (2) not to prosecute the same, (3) or not to give evidence thereof. It will be noted that all of said statutes are founded on an agreement or understanding, and, in event that there is no such agreement or understanding, it necessarily follows that none of these three sections would be violated. It is equally true that, although there might be an agreement between the parties, if the agreement was other than that of compounding or concealing the offense, not to prosecute the same, or not to give evidence thereof, then none of these statutes would operate."

We are unable to see how, from the evidence which was before the trial court, it could be said, as a matter of law, that the agreement entered into between the claimant and the deceased was an agreement or understanding, (1) to compound or conceal the criminal offense involved in the assault alleged to have been committed by the deceased upon the claimant; or (2) not to prosecute the same; or (3) not to give evidence thereof. Even if it be conceded that the evidence as to the agreement entered into, taken in the light of the surrounding circumstances, *might* have had reference to the criminal offense committed against the claimant, instead of to the claimant's right to a civil action for damages, it cannot be said, as a matter

of law, that the agreement *must* have referred to the criminal action. Even if there was a question as to whether the agreement had reference to the civil cause of action or to the criminal cause of action, the court could not direct a verdict but would have to submit such question to the jury under proper instructions.

It is claimed by the appellee, however, that, even if the alleged agreement was not to compound the criminal action, it was in part at least an agreement, not to circulate scandalous and discreditable information concerning his employer; that an employee is under a moral duty not to circulate scandalous and discreditable information concerning his employer, unless the disclosure be made for a public purpose; and that a consideration paid to an employee, on condition that he will not circulate such scandalous and discreditable information concerning his employer, being paid to the employee for not doing something which he is morally bound not to do, is against public policy, and an agreement based thereon is, therefore, unenforceable. We seriously doubt whether the proposition which is here presented by appellee has been sufficiently alleged in or can be considered as being a part of the grounds set out in appellee's motion for a directed verdict; but, even if it is sufficiently alleged, we do not think that there is anything in the agreement here involved that makes it, as a matter of law, violative of public policy and a barrier to claimant's right to recover on his claim. We have examined the cases cited by the appellee in support of his contention, and we do not think that any of them is applicable to the facts shown by the evidence in this case. None of these cases goes to the extent of holding that there is any duty upon an employee to refrain from enforcing a claim for damages against his employer for a tort committed against him by the employer. Nor do we see anything in public policy which would prevent an employee, who has a just claim for damages against an employer, growing out of a tort committed by the employer against the employee, from settling such claim amicably with his employer, and then, in compliance with a request of the employer, agree that he will refrain from disclosing the facts connected with the commission of such tort. If the law were otherwise, it would be a simple matter for an employer to abuse his employee to the extent of inflicting serious bodily injury on him; to then agree to pay such injured employee a substantial

amount in settlement for the damages which the employee has suffered, to be paid at some time in the future beyond the statutory period of limitation; to then request and secure the employee's promise to say nothing about the employer's wrongful acts; and then, when such employee attempted to enforce such agreement of settlement for his damages to avoid liability by claiming the invalidity of the agreement on the ground that it violated public policy.

Moreover, there is nothing in the evidence in this case from which we can say, as a matter of law, that the claimant was threatening to disclose discreditable information in regard to the deceased in connection with the tort alleged to have been committed by the deceased upon the claimant. So far as the evidence shows, the negotiations, in regard to the settlement made, were very brief, and were conducted in a peaceable and amicable manner. There is nothing in the evidence from which we could say, as a matter of law, that there was any demand or even a suggestion on the part of the claimant that could be said to amount to extortion. There is nothing in the evidence from which it could be said, as a matter of law, that there was any intention on his part to publish or circulate anything of a scandalous or discreditable nature in regard to his employer; or that the promise of Cuykendall to pay $6,000 was made because of fear on his part that scandalous and discreditable information would be circulated by the claimant concerning him.

In reaching our conclusion we are not deciding the merits of the claim presented in this case. We are basing our decision on the single proposition presented by the appellee's motion for a directed verdict. That motion was not based on any insufficiency of the evidence to support the claim; it was based on the proposition that the evidence showed affirmatively that the agreement, which was the basis of the claim, had a consideration, at least in part, in violation of public policy. We feel constrained to hold that, in sustaining this motion, the trial court was in error. Therefore, such order of the trial court and the judgment entered thereon are hereby reversed.—Reversed.

RICHARDS, C. J., and PARSONS, KINTZINGER, SAGER, and STIGER, JJ., concur.