Scott L. TINIUS, Plaintiff,

v.

CARROLL COUNTY SHERIFF DEPARTMENT; Carroll County Sheriff; Doug Bass, individually and in his official capacity; John Doe Deputies, individually and in their official capacity; St. Anthony Regional Hospital Auxiliary, Inc.; Erin Klekot; David McCoy; Tammy Roetman; Cherokee Mental Health Institute; and, G. Skorey, Defendants.

No. C03–3001–MWB.

United States District Court, N.D. Iowa, Central Division.

June 14, 2004.

J. Barton Goplerud, Ryan Edward Weese, Hudson, Mallaney & Shindler, PC, West Des Moines, IA, for Plaintiff.

William L Dawe, III, Hopkins & Huebner, Connie L. Diekema, Steven K.

Scharnberg, Finley Alt Smith Scharnberg Craig Hilmes & Gaffney, PC, Gordon E. Allen, Des Moines, IA, for Defendants.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ....................................1067
 A. Procedural Background ..........................................1067
 B. Factual Background ............................................1068

II. LEGAL ANALYSIS ..................................................1071
 A. Standards For Summary Judgment ..............................1071
 B. The Sheriff Defendants' Motion For Summary Judgment .................1072
 1. Substantive due process claim ...................................1072
 2. Fourth Amendment claim .....................................1074
 a. Community caretaking function ..............................1074
 b. Qualified immunity ......................................1076
 i. Applicable standards .......................................1076
 ii. Application of the standards .............................1077
 3. False imprisonment claim .......................................1079
 4. Assault and battery .............................................1079
 5. Intentional infliction of emotional distress ..........................1081
 6. Invasion of privacy .............................................1081
 7. Negligence ....................................................1084
 C. The Hospital Defendants' Motion For Summary Judgment ...............1085
 1. Application of Iowa Code § 668.11 .............................1085
 2. Applicability of EMTALA ......................................1087
 a. The terms of EMTALA ....................................1087
 b. Applicability of statute ....................................1088

III. CONCLUSION .....................................................1089

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

Plaintiff Scott L. Tinius filed this lawsuit on January 2, 2003, against various state and county officials and employees. At the center of this lawsuit is Tinius's continued detention by various defendants following his being stopped by Carroll County Deputies. In Count I of his complaint, Tinius alleges that defendants Carroll County Sheriff Department, Carroll County Sheriff, Doug Bass and John Doe Deputies ("The Sheriff Defendants") violated 42 U.S.C. § 1983 by violating Tinius's rights to substantive due process of law by unlawfully detaining him. In Count II, Tinius alleges that the Sheriff Defendants violated 42 U.S.C. § 1983 by violating Tinius's rights under the Fourth Amendment to be free from unlawful seizures by unlawfully detaining him. In Count III, Tinius alleges a claim for false imprisonment against all named defendants. In Count IV, Tinius alleges a claim for assault and/or battery against all named defendants. In Count V, Tinius alleges a claim for intentional infliction of emotional distress against all named defendants. In Count VI, Tinius alleges an invasion of privacy claim against all named defendants. In Count VII, Tinius alleges a negligence claim against all named defendants. Tinius contends that the defendants owed a duty to him to protect his constitutional rights which they breached by unlawfully

detaining him and subjecting him to unwanted physical intrusion.

The Sheriff Defendants filed for summary judgment on December 24, 2003. On January 8, 2004, defendants St. Anthony Regional Hospital Auxiliary, Inc., Erin Klekot, and Tammy Roetman ("The Hospital Defendants") filed for summary judgment. After obtaining extensions of time, plaintiff Tinius filed timely resistances to defendants' motions for summary judgment.

Before turning to a legal analysis of the motions for summary judgment, the court must first identify the standards for disposition of a motion for summary judgment, as well as the undisputed factual background of this case.

## B. Factual Background

The record reveals that the following facts are undisputed. On January 3, 2001, plaintiff Tinius drove from Marshalltown, Iowa, through Carroll County, Iowa. Tinius's pickup truck ran out of gas in Carroll County. Tinius was not wearing a coat. He was dressed in a sweatshirt, pants and loafers. Tinius was not carrying any identification. On January 3, 2001, Tinius had quite a bit going on in his life and he believes he was suffering from depression. After his pickup truck ran out of gas, he walked to a nearby farmhouse.

On the afternoon of January 3, 2001, Carroll County Sheriff Douglas Bass, Carroll County Deputy Sheriff William Croghan, and Carroll County Deputy Sheriff David Potthoff responded to a call of a reported burglary. George Johnston, the person who reported the incident, indicated that he had returned home from a funeral and found someone in the house.[1] Johnston also reported that the man was traveling on foot. Sheriff Bass and Deputies Croghan and Potthoff responded to the report by traveling in the direction of the residence of the reported burglary. Deputy Potthoff observed a man walking on the highway in that immediate area. Deputy Potthoff followed the man traveling on foot, while Sheriff Bass and Deputy Croghan went to the residence where the incident took place to investigate at the scene.

Deputy Potthoff approached the man traveling on foot, who was later identified as plaintiff Scott Tinius, exited his patrol car, and asked Tinius for his name and what he was doing. Tinius replied that he was "just walking down the road." Plaintiff's Suppl. App. at 5. Tinius refused to give Deputy Potthoff his name. Tinius was not wearing a coat and not carrying any identification. There is a dispute about what transpired next. Deputy Potthoff asserts that he continued for thirty minutes to ask Tinius questions but Tinius was uncooperative and incapable of carrying on a normal conversation. Tinius appeared to Deputy Potthoff to be intoxicated from alcohol or a controlled substance. Deputy Potthoff alleges that during this entire time Tinius never identified himself and that the only response Deputy Potthoff received during his questioning of Tinius was: "I don't think You need to know." Sheriff Defendants' App. at 22. On the other hand, Tinius asserts that although he initially didn't give Deputy Potthoff his name, he subsequently told the deputy his name and answered the deputy's other questions. Tinius further contends that he interacted with Deputy Potthoff for only about 5 minutes before being handcuffed and placed in the front

---

1. Plaintiff Tinius denies that he entered the house while Johnston was gone. He contends that he saw an older couple pulling into the residence and followed them to the door. He then asked for a drink of water and was invited into the residence. After finishing a glass of water, Tinius alleges that he left the residence and walked back to the highway.

seat of Deputy Potthoff's patrol car. Tinius also contends that he seemed fine and had not taken any drugs on that day.

Deputy Potthoff learned from Sheriff Bass and Deputy Croghan that under Iowa law a burglary had not occurred at the residence because there had been no forcible entry to the premises. Thus, Deputy Potthoff did not suspect Tinius of committing any crimes at this point. Deputy Potthoff, however, determined that Tinius, for his own safety and the safety of others, could not remain at large. At some point, Deputy Croghan arrived at the scene where Tinius and Deputy Potthoff were located. In Deputy Croghan's view, Tinius was "bonkers" and "totally out of it." Sheriff Defendants' App. at 31. From Deputy Croghan's prospective, Tinius had no idea where he was or what he was doing. In addition, Deputy Croghan though that Tinius was inappropriately dressed because he had no coat on and it was the beginning of January.

Tinius was handcuffed and placed in the front seat of Deputy Potthoff's patrol car. Tinius was told that he was not under arrest, but was being placed in handcuffs for his own safety and the safety of Deputy Potthoff. Tinius was then transported to St. Anthony Regional Hospital because the deputies felt that he was a danger to himself and to others. There is a dispute about what transpired during the ride to the hospital. Deputy Potthoff asserts that he continued to try to learn Tinius's identity but Tinius continued to be uncooperative. Tinius, on the other hand, asserts that he identified himself to Deputy Potthoff in the patrol car.

While Deputy Potthoff was engaged with Tinius, Deputy Croghan was tending to an abandoned vehicle not far from where Tinius was found. The abandoned vehicle, a pickup truck, which was out of gas, was Tinius's father's and had been driven by Tinius at some point. After a wrecker came to tow the pickup truck, Deputy Croghan met up with Deputy Potthoff at the hospital. Deputy Potthoff and Tinius had reached the hospital emergency room and were waiting there when Deputy Croghan arrived.

Tinius learned that he was being transported to the hospital when the patrol car pulled up the hospital's doors. Deputy Potthoff turned Tinius over to the care of the hospital staff but he and Deputy Croghan remained at the hospital to act, in his words, as a "security officer." Sheriff Defendants' App. at 23. The exits to the emergency room were blocked by the deputies who were present.

At the hospital, Tinius, who remained handcuffed, was first presented to defendant Tamara Roetman, an emergency room nurse. When Tinius arrived, Roetman observed him in an agitated state. Tinius was pacing about the room. His gate was steady and he was not staggering. Roetman was able to take Tinius's pulse, respiration, temperature and blood pressure, but he would not answer her questions and, in Roetman's opinion, did not "seem to understand" the questions she was asking. Sheriff Defendants' App. at 41. Roetman then contacted defendant Dr. David McCoy and reported that she had an agitated male in the emergency room. Dr. McCoy arrived and observed Tinius in an agitated state, and in his words, Tinius was "obviously under the influence" and "his mental state was not normal." Sheriff Defendants' App. at 54. Tinius was pacing around the emergency room, was not responding to questions appropriately in that, in Dr. McCoy's estimation, he was unable to give his name. Dr. McCoy concluded that Tinius's mental state was not stable and that he was most likely under the influence of drugs, alcohol or both. Tinius was medically stable.

Dr. McCoy ordered a blood and urine test for Tinius. At the time Tinius presented to the emergency room, it was believed that he was under the influence of either alcohol or drugs. The blood test was ordered to determine if Tinius could be treated at St. Anthony or if he needed to be transferred to another hospital which was better equipped to treat patients with psychiatric problems. Thus, the blood test was to be used to determine if Tinius was suffering from a physical illness or some type of mental problem. Because St. Anthony's does not have the capability to process blood specimens quickly, it takes two days to get the results of a blood test, a urine test was also ordered. A urine sample can be processed quickly, and in this case prompt results were needed in order to determine the proper course of treatment for Tinius. Nurse Roetman obtained a urinal from the cupboard and attempted to assist Tinius in obtaining a urine sample. However, Tinius was unable to urinate. There is a dispute about whether Tinius was communicative at this point. Nurse Roetman testified that Tinius never made any verbal statements. Tinius counters that he told Nurse Roetman that he could not urinate.

In order to obtain a urine sample, it was decided that Roetman would have to insert a catheter. Dr. McCoy, Nurse Roetman, and the deputies discussed a plan to catheterize Tinius. Tinius was not asked if he wanted to be catheterized. Again, there is a dispute about what transpired next. Nurse Roetman testified that while she did not ask Tinius for his consent to the insertion of the catheter, a discussion about catheterizing Tinius was conducted in his presence. Roetman also testified that prior to insertion of the catheter, she informed Tinius what she was about to do. In contrast, Tinius asserts that he had no idea what was transpiring when Roetman left the examination room and reappeared with the catheter kit. The Sheriff's deputies did not apply for a search warrant prior to the withdrawal of Tinius's urine sample.

Nurse Roetman took off Tinius's pants and he was restrained on a cart by Deputy Potthoff and two other deputies. Both of Tinius's arms were handcuffed. Roetman then inserted the catheter into Tinius's penis under sterile technique and obtained the needed urine specimen. Tinius yelled when the catheter was inserted and attempted to move during the catheter's insertion but he was restrained by the officers.

While Dr. McCoy was waiting for the results of the urinalysis, he consulted with a staff psychiatrist at St. Anthony's, Dr. Erin Klekot. Dr. McCoy contacted Dr. Klekot because it was apparent to him, based on his clinical impressions, that Tinius's case was beyond his ability for definitive care and he needed the help of a psychiatrist. During the initial telephone conversation between Dr. McCoy and Dr. Klekot, Dr. McCoy relayed that a patient had presented to the emergency room and had been found wandering on a gravel road, was incoherent and was answering questions inappropriately. Dr. McCoy also stated that Tinius's condition was most likely due to a psychiatric problem and wanted him admitted to the psych unit.

Since Tinius's urinalysis results were not back, it was unclear what, if anything, was in Tinius's system. Dr. Klekot advised Dr. McCoy that if Tinius needed to be detoxified he could not be admitted to the psych unit at St. Anthony. Dr. McCoy and Dr. Klekot made the decision to have Tinius transferred to a facility that could care for him. Dr. Klekot went to the emergency room to help make arrangements for the transfer. Dr. Klekot contacted Cherokee Mental Hospital. Dr. Klekot's contact with the Cherokee Mental Hospital was

made prior to receiving Tinius's urinalysis results. However, Dr. Klekot received the results of Tinius's urinalysis while he discussing Tinius's admission at Cherokee Mental Hospital. Dr. Klekot told the admissions nurse that there was a patient at St. Anthony's emergency room who had been brought in and had tested positive for amphetamines, marijuana and cannabinoids. Dr. Klekot also informed the admissions nurse that Tinius appeared to be medically stable and that all of his vital signs were stable. The admissions nurse told Dr. Klekot that Cherokee Mental Hospital had a bed available for Tinius.

Dr. Klekot was put in touch with Dr. Skorey, a psychiatrist at Cherokee Mental Hospital who advised her that Cherokee Mental Hospital would accept Tinius under a court-ordered commitment. A court-ordered commitment involves filling out a petition, two witnesses signing an affidavit testifying that the patient is a threat to himself or others, and requires magistrate approval of the commitment. Dr. Klekot filled out the petition and she, along with Dr. McCoy, signed the affidavits. Dr. Klekot contacted Iowa State Magistrates Bill Polking and Eric Neu. Both magistrates visited the emergency room where they had the opportunity to observe Tinius. Magistrates Polking and Neu approved Tinius's commitment and he was transported by Deputy Kevin Caltrider to Cherokee Mental Hospital for observation.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–

74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. . . . *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage

of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of the defendants' motions for summary judgment.

### B. The Sheriff Defendants' Motion For Summary Judgment

The Sheriff Defendants have sought summary judgment on each of the seven claims against them. The court will address each claim *seriatim*.

### 1. Substantive due process claim

The Sheriff Defendants initially seek summary judgment on plaintiff Tinius's claim that the Sheriff Defendants violated his substantive due process rights when they detained him. The Sheriff Defendants contend that Tinius's allegations of unlawful detention cannot support a substantive due process claim because such claims are covered by the Fourth Amendment and must be analyzed under the reasonableness standard governing searches and seizures.

The Eighth Circuit Court of Appeals has observed that:

> The Fourteenth Amendment guarantees "[s]ubstantive due process[, which] prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (*en banc*). To that end, the Fourteenth Amendment prohibits "conduct that is so outrageous that it shocks the conscience or otherwise offends 'judicial notions of fairness, [or is] offensive to human dignity.'" *Id.* (quoting *Weimer v. Amen*, 870 F.2d 1400, 1405 (8th Cir. 1989)) (alteration in original).

*Moran v. Clarke*, 296 F.3d 638, 643 (8th Cir.2002) (*en banc*); *accord Pediatric Specialty Care, Inc. v. Arkansas Dep't of Human Servs.*, 364 F.3d 925, 931 (8th Cir. 2004) (quoting *Moran*, 296 F.3d at 643).

Following the United States Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Eighth Circuit Court of Appeals, sitting en banc, held that a plaintiff bringing a substantive due process claim "must demonstrate both that the official's conduct was conscience-

shocking, and that the official violated one or more fundamental rights that are 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.' " *Slusarchuk v. Hoff,* 346 F.3d 1178, 1181 (8th Cir.2003) (quoting *Moran,* 296 F.3d at 651) (Bye, J., concurring and writing for a majority on this issue) (citations omitted), *cert. denied,* —— U.S. ——, 124 S.Ct. 2018, 158 L.Ed.2d 492 (2004).

■ However, as noted above, the Sheriff Defendants contend that before proceeding to considering the merits of Tinius's substantive due process claim, the court must first consider the principle that if " 'a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.' " *Lewis,* 523 U.S. at 842, 118 S.Ct. 1708 (quoting *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)); *see Moran,* 296 F.3d at 643; *see also Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1203 (10th Cir.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 1411, 158 L.Ed.2d 79 (2004); *Catletti ex rel. estate of Catletti v. Rampe,* 334 F.3d 225, 229 (2nd Cir.2003); *Johnson v. City of Cincinnati,* 310 F.3d 484, 490 (6th Cir. 2002), *cert denied,* 539 U.S. 915, 123 S.Ct. 2276, 156 L.Ed.2d 130 (2003); *Eby–Brown Co. v. Wisconsin Dep't of Agric.,* 295 F.3d 749, 753 (7th Cir.2002). Seeking to resolve this dispute outside the Fourteenth Amendment's due process protections, the Sheriff Defendants argue that the Fourth Amendment provides the exclusive analyt-

ical framework to assess the constitutionality of their actions here.[2] The Sheriff Defendants argue that their actions in seizing Tinius, transporting him to the hospital, holding him at the hospital, and in restraining him during an involuntary catheterization must be evaluated under the rubric of Fourth Amendment reasonableness. The court agrees and concludes that the uncontested facts in this case are properly analyzed under the Fourth Amendment, not the Fourteenth.

In *Dubbs,* 336 F.3d 1194, the Tenth Circuit Court of Appeals held last year, in the context of a claim to be free from unauthorized medical examinations, that the physical examinations challenged were searches for purposes of the Fourth Amendment, and such privacy interests could "be vindicated under that 'explicit textual source of constitutional protection.' " *Id.* at 1203 (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Thus, the court of appeals declined to consider those claims advanced under the rubric of substantive due process which were more precisely addressed under the Fourth Amendment. *Id.; see United States v. Kimler,* 335 F.3d 1132, 1146 (10th Cir.2003) (holding that claim of right to be free from unwanted DNA testing implicates a Fourth Amendment right). Here, because the deputies' actions in stopping Tinius, transporting him to the hospital, and in assisting in the involuntary catheterization unquestionably involve a seizure within the meaning of the Fourth Amendment, the court concludes that the correct path to follow is the Fourth Amendment's explicit protection rather than a principle implied by the structure of the Constitution. The court will, therefore,

---

**2.** The Fourth Amendment provides:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall is-

sue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. CONST. amend. IV.

consider Tinius's claims under the Fourth Amendment. Therefore, the court grants the Sheriff Defendants' Motion For Summary Judgment with respect to Count I.

### 2. Fourth Amendment claim

#### a. Community caretaking function

The Sheriff Defendants next seek summary judgment on plaintiff Tinius's claim that the Sheriff Defendants violated his rights under the Fourth Amendment when they detained him, transported him to the hospital, and assisted in his involuntary catheterization. The Sheriff Defendants argue that they did not violate Tinius's Fourth Amendment rights. They contend that they were justified in detaining Tinius under the officers' "community caretaking" function, in order to investigate Tinius's physical and mental condition. Tinius disagrees, arguing that the reasonableness of the officers' actions ended when they restrained him and assisted in the forced catheterization of him to obtain a urine sample.

The United States Supreme Court discussed the community caretaking functions of law enforcement officers in *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Cady*, the Supreme Court held that the search of a trunk of a disabled car was not unreasonable under the Fourth and Fourteenth Amendments, even though the local police officer conducting the search had not previously obtained a search warrant. *Cady*, 413 U.S. at 446, 93 S.Ct. 2523. In reaching this holding, the Court explained that local police officers frequently "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441, 93 S.Ct. 2523. The Court went on to note that "[t]he fact that the protection of the public might, in the ab-

stract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Id.* at 447, 93 S.Ct. 2523. Following *Cady*, the federal circuit courts of appeals, including the Eighth Circuit Court of Appeals, have had occasion to recognize the existence of this community caretaking function and discuss its parameters. *See Winters v. Adams*, 254 F.3d 758 (8th Cir.2001); *United States v. Smith*, 162 F.3d 1226, 1226 (8th Cir. 1998); *see also Finsel v. Cruppenink*, 326 F.3d 903, 907–08 (7th Cir.2003); *United States v. Jackson*, 189 F.3d 502, 509 (7th Cir.), *cert. denied*, 528 U.S. 979, 120 S.Ct. 432, 145 L.Ed.2d 338 (1999); *Smith v. Thornburg*, 136 F.3d 1070, 1075 (6th Cir. 1998); *United States v. Hunnicutt*, 135 F.3d 1345, 1351 (10th Cir.1998); *United States v. Rohrig*, 98 F.3d 1506, 1523 (6th Cir.1996); *United States v. Rodriguez–Morales*, 929 F.2d 780, 787 (1st Cir.1991), *cert. denied*, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992); *United States v. Erickson*, 991 F.2d 529, 531–32 (9th Cir. 1993); *United States v. King*, 990 F.2d 1552, 1560–61 (10th Cir.1993); *United States v. Rideau*, 949 F.2d 718, 720 (5th Cir.1991), *reversed on other grounds*, 969 F.2d 1572 (5th Cir.1992); *United States v. Johnson*, 734 F.2d 503, 505 (10th Cir.1984); *United States v. Newbourn*, 600 F.2d 452 (4th Cir.1979).

In *Winters*, the police received a complaint concerning an unknown individual in a residential area of the city. The complaint indicated that this individual was possibly intoxicated and had been observed exiting and reentering a vehicle that was parked on a dead-end street. *Winters*, 254 F.3d at 760. When officers arrived to investigate the complaint they observed an individual, later identified as Winters, seated behind the wheel of a car parked in the location matching the location described in the complaint. *Id.* When the officers approached the automobile, the

individual appeared agitated and "began moving 'wildly' about the car." *Id.* at 761. The officers began to suspect that the person had " 'ingested or used some type of illegal drug and maybe used too much and was overdosing.' " *Id.* The individual "became increasingly agitated with the officers and yelled at them to leave him alone." *Id.* Although the officers had witnessed no illegal activity by the individual, the officers believed that the person was seriously "mentally impaired" or under the influence of some type of controlled substance and in need of medical assistance. *Id.* After breaking the passenger window of the car with a nightstick, the officers forcibly removed the individual from the car and had him transported to a hospital by ambulance. Relying upon the reasoning of the Tenth Circuit Court of Appeals in *King,* 990 F.2d at 1560–61, and the Fifth Circuit Court of Appeals in *Rideau,* 949 F.2d at 720, the Eighth Circuit Court of Appeals concluded that the officers, in exercising their community caretaking function, were justified in their forcible removal of Winters from his car, even without suspicion of criminal activity, because the officers " 'would have been derelict in their duties' had they not detained appellee Winters." *Id.* at 764.

In community caretaking cases, as elsewhere, reasonableness has a fluid quality. The term embodies a general ideal, one which cannot be usefully refined "in order to evolve some detailed formula for judging cases." *Cady,* 413 U.S. at 448, 93 S.Ct. 2523; *accord United States v. LaFrance,* 879 F.2d 1, 6 (1st Cir.1989) ("what is reasonable in one type of situation may not be reasonable in [an]other"). The crux of the issue in this case is whether the Sheriff Defendants acted reasonably when they restrained Tinius in order to permit the hospital staff to obtain a urine sample by means of catheterization. Tinius contends the officers' actions exceeded the scope of their community caretaking function be-

cause there was no suspicion that a crime had been committed and that "[t]he officers had no business assisting the hospital with the involuntary catherization proceeding." Plaintiff's Reply Br. at 10.

■ Reasonableness, as the text of the Fourth Amendment indicates, is the touchstone for determining the constitutionality of the Sheriff Defendants' actions. *See Cady,* 413 U.S. at 439, 93 S.Ct. 2523. Here, the court concludes that the officers had a legitimate reason for detaining Tinius and transporting him to the hospital, and a non-investigatory justification for assisting in his involuntary catheterization. Deputy Potthoff came across Tinius walking along the roadway in rural Iowa in midst of winter without proper winter attire. It is uncontested that Tinius had taken marijuana and methamphetamine in the previous days and that he still had controlled substances in his system when he encountered Deputy Potthoff. Deputy Potthoff believed that Tinius could not be left along the road, as he posed a safety hazard to both himself and to others. Deputy Potthoff would have been remiss in his duties had he left Tinius along the road in such a condition. The deputies transported Tinius to the hospital for the non-investigatory purpose of providing him with medical and/or psychological assistance. Once the Sheriff Defendants brought Tinius to the hospital, they had no input in the decisions made by the medical personnel at the hospital. The Sheriff Defendants did not request that hospital personnel perform any specific tests on Tinius. Rather, the Sheriff Defendants remained at the hospital to maintain the peace. It was in this capacity that the officers intervened during the catheterization procedure in order to provide protection to the hospital staff who were attempting to obtain a urine sample for diagnostic purposes only. The officers

actions were eminently reasonable given that it was they who had brought Tinius to that facility. They would have been derelict in their duties if they had merely transported Tinius to the hospital and foisted him, an individual with possible psychological difficulties, upon the staff of a small town hospital. Thus, the court concludes that the Sheriff Defendants' actions here were reasonable and in keeping with their community caretaking functions when they detained Tinius and later restrained him during the catheterization procedure and did not violate the Fourth Amendment by their actions. Therefore, the court grants the Sheriff Defendants' Motion For Summary Judgment with respect to Count II.

### b. *Qualified immunity*

Because the court has granted summary judgment in favor of the Sheriff Defendants with respect to those claims contained in Count II, it is unnecessary for the court to consider the Sheriff Defendants' arguments that they are shielded from liability because they are entitled to qualified immunity. Nonetheless, the court will address the question of whether, assuming arguendo, that the Sheriff Defendants had violated Tinius's Fourth Amendment rights by unreasonably detaining him or by restraining him during the catheterization procedure, the officers are entitled to qualified immunity for their actions.

### i. *Applicable standards*

"Qualified immunity shields governmental officials from personal liability if their actions, even if unlawful, were 'nevertheless objectively reasonable in light of the clearly established law at the time of the events in question.'" *Turpin v. County of Rock*, 262 F.3d 779, 783 (8th Cir.2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Thus, "[q]ualified immunity is a

defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir.2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir.2001) (also quoting *Harlow*). "In other words, officials are protected by qualified immunity so long as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Wilson*, 260 F.3d at 951 (quoting *Anderson*, 483 U.S. at 638, 107 S.Ct. 3034).

"In determining if [defendants] are entitled to qualified immunity [courts] must ask whether [the plaintiffs] stat[e] a violation of a constitutional right, and whether that right was clearly established at the time, such that a reasonable officer would have known that his conduct violated the law." *Wilson*, 260 F.3d at 951 (citing *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir.2001)); *see also Turpin*, 262 F.3d at 783 ("The inquiry in determining whether the officers are entitled to qualified immunity focuses on whether the [plaintiffs] have asserted a violation of a clearly-established constitutional right and, if so, whether there are genuine issues of material fact as to whether a reasonable official would have known that the alleged action indeed violated that right."); *Hunter v. Namanny*, 219 F.3d 825, 829 (8th Cir. 2000) (describing the test as a "three-part inquiry" under which the court asks "(1) whether [the plaintiff] has asserted a violation of a constitutional or statutory right; (2) if so, whether that right was clearly established at the time of the violation; and (3) whether, viewing the facts in the light most favorable to [the plaintiff], there are genuine issues of material fact as to whether a reasonable official would have

known that the alleged action indeed violated that right").

The Eighth Circuit Court of Appeals has held further that:

> To be "clearly established," the right's contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Hope v. Pelzer,* 536 U.S. 730, 738–39, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666, —— (2002). There is no requirement, however, "that the very action in question has previously been held unlawful, but rather, in the light of pre-existing law the unlawfulness must be apparent." *Vaughn,* 253 F.3d at 1129 (internal quotations and citations omitted); *see also Hope,* 536 U.S. at 738–39, 122 S.Ct. at 2515; *id.* at 2522 (Thomas, J., dissenting).

*Turner v. Arkansas Ins. Dept.,* 297 F.3d 751, 755 (8th Cir.2002). Moreover, "[t]he law is clearly established if the law was sufficiently developed to give the official 'fair warning' that his alleged conduct violated the plaintiff's rights." *Shade v. City of Farmington, Minnesota,* 309 F.3d 1054, 1059 (8th Cir.2002) (citing *Hope v. Pelzer,* 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

■ The test for qualified immunity at the summary judgment stage of a proceeding is an objective one: The plaintiff must demonstrate that the law is clearly established and the defendant then bears the burden of showing that his conduct either does not violate plaintiff's rights or that there were extraordinary circumstances and that the defendant neither knew nor should have known of the relevant legal standard. *Johnson–El v. Schoemehl,* 878 F.2d 1043, 1048 (8th Cir.1989). If the plaintiff can show that the defendant's conduct violated clearly established law, "then the defendant, as the movant for summary judgment, must demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions." *Cross v. City of Des Moines,* 965 F.2d 629, 632 (8th Cir.1992) (quoting *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir.1991)); *Johnson–El,* 878 F.2d at 1048 ("The defendant bears the burden of proof with respect to all other elements of the defense").

### ii. Application of the standards

The Sheriff Defendants argue that Tinius cannot show that the law is clearly established with regard to the officers' conduct in detaining Tinius and later restraining him during the catheterization procedure. In other words, the Sheriff Defendants claim that their conduct did " 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Busch v. City of Anthon,* 173 F.Supp.2d 876, 900 (N.D.Iowa 2001) (citing *Carroll v. Pfeffer,* 262 F.3d 847, 849 (8th Cir.2001)) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727). The court agrees. In *Winters,* the Eighth Circuit Court of Appeals found that even if the police had violated the plaintiff's Fourth Amendment rights by unreasonably detaining him or by employing excessive force, the officers were entitled to qualified immunity for their actions. *Winters,* 254 F.3d at 765. The court of appeals observed that:

> Even if this Court had determined that the appellants were not permitted to detain appellee under the community caretaking function, the Court finds that the appellants were reasonable in their beliefs that this duty permitted them to briefly detain and investigate the identity and circumstances of appellee. As discussed earlier in this opinion, the availability of the community caretaking

function as an alternative to reasonable suspicion under *Terry v. Ohio* is still a subject of debate in the courts. Thus, the appellants' conduct cannot be found to have violated "clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727, and the appellants are therefore entitled to qualified immunity on the Fourth Amendment illegal detention claim.

*Id.* at 766.

■ When determining if the officers' actions were reasonable for qualified immunity purposes, this court must examine the information known by the officers at the time of the entry. *See Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The United States Supreme Court has directed that lower courts not take an overly broad a view of what constitutes clearly established law:

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent."

*Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (citation omitted). Thus, the Eighth Circuit Court of Appeals has instructed that "a precedential case need not be on all fours to clearly establish a constitutional violation, but it must be sufficiently analogous to put a reasonable officer on notice that his conduct was unconstitutional." *Hill v. McKinley*, 311 F.3d 899, 901 (8th Cir.2002) (citing *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir.2002)).

■ Here, on January 3, 2001, the date of the actions at issue in this litigation, neither the United States Supreme Court nor the Eighth Circuit Court of Appeals had addressed the applicability of the community caretaker exception to the restraining of a person during a medical procedure being conducted for non-investigatory purposes. Moreover, the Eighth Circuit Court of Appeals had not yet decided *Winters*. Thus, the United States Supreme Court has not spoken authoritatively on the issue of the restraining of a person during a medical procedure being conducted for non-investigatory purposes, and the Eighth Circuit Court of Appeals also has never addressed this issue. At the time of the actions at issue in this case, the Tenth Circuit had, in *United States v. King*, 990 F.2d at 1560, applied the Supreme Court's reasoning in *Cady* to the seizure of an individual, explaining that: "police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'" *Id.* at 1560 (quoting *Cady*, 413 U.S. at 441, 93 S.Ct. 2523). The Tenth Circuit Court of Appeals further explained that "[i]n the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person ... in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *Id.* This is precisely what the Sheriff Defendants believed they were doing in this case—transporting Tinius to the hospital in order that he could be provided with medical and/or psychological assistance. Thus, the court concludes that the Sheriff Defendants did not violate any clearly established law when they detained Tinius and later restrained him during the catheterization procedure. Therefore, the court concludes that the Sheriff Defendants are entitled to qualified immunity on

Tinius's Fourth Amendment claims and grants this portion of the Sheriff Defendants' Motion for Summary Judgment.

### 3. False imprisonment claim

■ The Sheriff Defendants next seek summary judgment on Tinius's claim for false imprisonment. The Iowa Supreme Court has instructed that: "The tort of false imprisonment involves 'an unlawful restraint on freedom of movement or personal liberty.'" *Ette ex rel. Ete v. Linn–Mar Community Sch. Dist.*, 656 N.W.2d 62, 70 (Iowa 2002) (quoting *Nelson v. Winnebago Indus., Inc.*, 619 N.W.2d 385, 388 (Iowa 2000)); *accord Valadez v. City of Des Moines*, 324 N.W.2d 475, 477 (Iowa 1982). Under Iowa law, the following two elements must be proven to establish such a claim: "'(1) detention or restraint against a person's will, and (2) unlawfulness of the detention or restraint.'" *Ette ex rel. Ette*, 656 N.W.2d at 70 (quoting *Nelson*, 619 N.W.2d at 388); *accord Valadez*, 324 N.W.2d at 477. False arrest is indistinguishable from false imprisonment. *Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984); *Children v. Burton*, 331 N.W.2d 673, 678–79 (Iowa), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983). The parties agree that Tinius was detained against his will, but differ on the second element—the unlawfulness of Tinius's detention. For the reasons noted above, the court has concluded that the Sheriff Defendants were engaged in their community caretaking functions when they detained Tinius and thus their detention was not unlawful. Thus, the court finds that the Sheriff Defendants are entitled to judgment as a matter of law on Tinius's false imprisonment claim. Therefore, this portion of the Sheriff Defendants' Motion For Summary Judgment is granted.

### 4. Assault and battery

The Sheriff Defendants also seek summary judgment on Tinius's claims for assault and battery. The Sheriff Defendants argue that the officers were properly performing their "community caretaking" function when they detained Tinius and later restrained him during the catheterization procedure. Iowa courts have sometimes looked to the criminal code's definition of assault as defining the elements of assault in civil actions for damages or other relief. *See In re Cuykendall's Estate*, 223 Iowa 526, 273 N.W. 117, 119 (1937); *see also Bacon v. Bacon*, 567 N.W.2d 414, 417 (Iowa 1997) (in an action for relief from domestic abuse under IOWA CODE CH. 232, domestic abuse under IOWA CODE § 236.2 is defined as assault within the meaning of IOWA CODE § 708.1). Although "[a]ssault can be committed in several ways," *Bacon*, 567 N.W.2d at 417, the pertinent definitions here, as in *Bacon*, are as follows:

A person commits an assault when, without justification, the person does any of the following:

(1) Any act which is intended to cause pain or injury to, or which is intended to result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act.

(2) Any act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act.

IOWA CODE § 708.1(1) & (2); *accord Bacon*, 567 N.W.2d at 417. These elements are comparable to the elements of the tort of assault as defined by the RESTATEMENT (SECOND) OF TORTS:

§ 21. Assault

(1) An actor is subject to liability to another for assault if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

(b) the other is thereby put in such imminent apprehension.

RESTATEMENT (SECOND) OF TORTS § 21; *see Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 38 & n. 4 (Iowa 1993) (looking to the Iowa Civil Jury Instructions and the RESTATEMENT (SECOND) OF TORTS for the elements of assault to determine whether a civil assault claim is preempted by the Iowa Civil Rights Act); Iowa Civil Jury Instructions Nos.1900.1 & 1900.2 (defining assault based on RESTATEMENT (SECOND) OF TORTS § 21, 31, 32). Thus, assault consists of " 'acts threatening violence [or offense] to the person of another; coupled with the means, ability, and intent to commit the violence [or offense] threatened.' " *Schneider v. Middleswart*, 457 N.W.2d 33, 35 (Iowa Ct.App.1990) (quoting *Holdorf v. Holdorf*, 185 Iowa 838, 841, 169 N.W. 737, 738 (1918)); *accord Bacon*, 567 N.W.2d at 417–18 (assault for the purposes of a civil action for domestic abuse consists of the "intent" element and "the apparent ability to execute the act" element). The focus is on the offender's intent, not the victim's expectations. *Bacon*, 567 N.W.2d at 418.

"It is elementary, of course, that it is not necessary, in order to establish an assault, to show that there was also a battery, or that the person assaulted suffered any particular bodily injury as the result of such assault." *In re Cuykendall's Estate*, 273 N.W. at 119. However, Tinius has also alleged battery. The RESTATEMENT (SECOND) OF TORTS defines a "battery" as follows:

§ 13. Battery: Harmful contact

An actor is subject to liability to another for battery if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

(b) a harmful contact with the person or the other directly or indirectly results.

RESTATEMENT (SECOND) OF TORTS § 13; *see* Iowa Civil Jury Instructions No.1900.3 & 1900.4 (relying on RESTATEMENT (SECOND) OF TORTS § 13 and 18); *accord Greenland*, 500 N.W.2d at 38 & n. 5 (looking to the Iowa Civil Jury Instructions and the RESTATEMENT (SECOND) OF TORTS for the elements of battery to determine whether a civil battery claim is preempted by the Iowa Civil Rights Act).

A law enforcement officer may use reasonable force in the performance of his or her duty. Here, it is undisputed that the officers did not touch Tinius in rudeness or in anger when escorting him to the patrol car, taking him to the hospital, or in restraining him during the catheterization procedure. The deputies were not acting with the intent to cause Tinius physical pain. Rather, they were acting in their community caretaking function to obtain medical and/or psychological assistance for Tinius when they took their actions. Because the circumstances attending the Sheriff Defendants and the precise amount of force they used on Tinius are not in dispute, the court concludes that the Sheriff Defendants are also entitled to summary judgment on these claims. Therefore, this portion of the Sheriff Defendants' Motion For Summary Judgment is also granted.

## 5. Intentional infliction of emotional distress

The court next takes up Tinius's claim for intentional infliction of emotional distress. As the Iowa Supreme Court has explained:

> To establish a prima facie claim for intentional infliction of emotional distress the plaintiff must satisfy the following four elements: (1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress;(3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress. *Steckelberg v. Randolph,* 448 N.W.2d 458, 461 (Iowa 1989).
>
> Before defendants' conduct can be considered outrageous, it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harsha v. State Savs. Bank,* 346 N.W.2d 791, 801 (Iowa 1984). Outrageous conduct must be established by substantial evidence. *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 118 (Iowa 1984).

*Fuller v. Local Union No. 106 of United Broth. of Carpenters,* 567 N.W.2d 419, 423 (Iowa 1997).

 With respect to Tinius's claim for intentional infliction of emotional distress, the court finds as a matter of law that Tinius cannot establish that the Sheriff Defendants' conduct was extreme and outrageous. As discussed above, when the officers came across Tinius he was walking along the roadway in rural Iowa in January without proper winter attire. The officers became concerned about Tinius's mental health and his ability to care for himself. It was objectively reasonable for the Sheriff Defendants to restrain Tinius and transport him to a hospital based on their belief that he was a danger to himself or others, and in possible need of medical or psychological care and treatment. Once at the hospital, the officers did not determine a course of treatment. Rather, they merely assisted in restraining Tinius in order that a urine sample could be obtained which was necessary for diagnostic purposes. The court concludes that the Sheriff Defendants' actions here do constitute such extreme or outrageous conduct as to give rise to a claim for intentional infliction of emotional distress. Thus, the court grants summary judgment to the Sheriff Defendants on Tinius's intentional infliction of emotional distress claim.

## 6. Invasion of privacy

The Sheriff Defendants also seek summary judgment on Tinius's claims for invasion of privacy. The Iowa Supreme Court first recognized the tort of invasion of privacy in *Bremmer v. Journal–Tribune Publ'g Co.,* 247 Iowa 817, 76 N.W.2d 762 (1956). *See Stessman v. American Black Hawk Broad. Co.,* 416 N.W.2d 685, 686 (Iowa 1987); *Howard v. Des Moines Register & Tribune Co.,* 283 N.W.2d 289, 291 (Iowa 1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980); *Winegard v. Larsen,* 260 N.W.2d 816, 822 (Iowa 1977). Since the recognition of the tort in *Bremmer,* the Iowa Supreme Court has adopted and applied the principles of invasion of privacy articulated in the Restatement (Second) of Torts (1977). *See Stessman,* 416 N.W.2d at 686; *Lamberto v. Bown,* 326 N.W.2d 305, 309 (Iowa 1982); *Anderson v. Low Rent Housing Comm'n of Muscatine,* 304 N.W.2d 239, 248 (Iowa), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 645, 70 L.Ed.2d 621 (1981); *Howard,* 283 N.W.2d at 291; *Winegard,* 260 N.W.2d at 822; *see also Hill v. McKinley,* 311 F.3d 899, 905–06 (8th Cir.2002). The Restate-

ment principles the Iowa Supreme Court has adopted are found in § 652A and subsequent sections defining each form of the tort. Section 652A states as follows:

(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

(2) The right of privacy is invaded by

(a) unreasonable intrusion upon the seclusion of another, as stated in § 652B; or

(b) appropriation of the other's name, or likeness, as stated in § 652C; or

(c) unreasonable publicity given to the other's private life, as stated in § 652D; or

(d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E.

RESTATEMENT (SECOND) OF TORTS § 652A (1977).

The sole form of the tort in question here, intrusion upon seclusion, was defined in *Winegard* as follows: "Category (a) requires an intentional intrusion upon the solitude or seclusion of another which would be highly offensive to a reasonable person." *Winegard,* 260 N.W.2d at 822.[3]

**3.** Comments to the Restatement (Second) of Torts § 652B further clarify this formulation of the tort:

a. The form of invasion of publicity covered by this Section does not depend upon any publicity given to the person whose interest is invaded or to his affairs. It consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.

b. The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objections in entering his home. It may also be by use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping telephone wires. It may be by some other form of investigation or examination into his private concerns, as by opening his private mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents. The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of photograph or information outlined....

c. The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place,

or has otherwise invaded a private seclusion that plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection. Nor is there liability for observing him or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye. Even in a public place, however, there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters....

d. There is likewise no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object. Thus there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded....

RESTATEMENT (SECOND) OF TORTS § 652B cmts. a-d (1977).

To recover under the intrusion upon seclusion theory of the tort,

> a plaintiff must show, first, that the defendant intentionally intruded upon the seclusion that the plaintiff "has thrown about [his or her] person or affairs." RESTATEMENT § 652B comment c; *accord Winegard,* 260 N.W.2d at 822. Second, the intrusion must be one that would be "highly offensive to a reasonable person." *Winegard,* 260 N.W.2d at 822; *accord* Restatement § 652B. The defendant is not liable, however, if the plaintiff is already in public view. RESTATEMENT § 652B comment c.

*Stessman,* 416 N.W.2d at 687; *see also Fletcher v. Price Chopper Foods of Trumann, Inc.,* 220 F.3d 871, 875 (8th Cir. 2000) (In construing Arkansas law the court found that: "The tort consists simply of three parts: (1) an intrusion (2) that is highly offensive (3) into some matter in which a person has a legitimate expectation of privacy.").

The Iowa courts have made no other articulation of the elements of the intrusion on seclusion theory of the tort. As the Eighth Circuit Court of Appeals pointed out in its *Hill* decision:

> According to the Restatement, the standard for "intrusion upon seclusion" is an "intentional intrusion upon the solitude or seclusion of another which would be highly offensive to a reasonable person." *Id.* (citing Restatement (Second) of Torts § 652B). The Iowa Supreme Court has not explained in any great detail the elements required to meet this standard. Other courts that have confronted "intrusion upon seclusion" cases have emphasized that the conduct must be highly offensive to a reasonable person. *See Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 622 (3rd Cir.1992) (applying Pennsylvania law and citing the Restatement); *Fields v. Atchison, Topeka, and Santa Fe Ry. Co.,* 985

> F.Supp. 1308, 1312 (D.Kan.1997) ("both the manner of intrusion as well as the nature of the information acquired ... must rise to the level of being highly offensive to the reasonable person"), *withdrawn in part,* 5 F.Supp.2d 1160 (D.Kan.1998); *Watkins v. United Parcel Service, Inc.,* 797 F.Supp. 1349, 1359–60 (S.D.Miss.1992) (Mississippi law requires conduct "to which a reasonable man would strongly object" and "some bad faith or utterly reckless prying"), aff'd, 979 F.2d 1535 (5th Cir.1992).

*Hill,* 311 F.3d at 905–06.

In *Hill,* the plaintiff was arrested for public intoxication and was brought to jail. After plaintiff was uncooperative during the booking process, pounded and kicked at the door of the holding cell, defendants decided to place plaintiff in the jail's padded cell. Plaintiff was required to remove her clothing in the presence of male guards and was placed naked in the padded cell. *Id.* at 901. After plaintiff yelled and struck at the walls and door of the padded cell, defendants decided to remove plaintiff from the padded cell and place her on a restraining board. To do so, officers of both sexes removed plaintiff from the padded cell and, while still naked, walked her down the hall of the jail to another room where she was strapped down to a restrainer board face down, naked, and in a spread eagle position. *Id.* at 902. Plaintiff remained strapped to the board for approximately three hours. *Id.* In affirming the jury's verdict on plaintiff's invasion of privacy claim, the Eighth Circuit Court of Appeals found that:

> We cannot say that as a matter of law the defendants' actions were not an unreasonable and highly offensive intrusion upon Hill's privacy. There is no question that being marched down a hallway by several persons, including members of the opposite sex, and then

being strapped face-down to a board in a spread-eagle position, all while completely naked, would be considered highly offensive by ordinary persons. There is sufficient evidence to support the jury's apparent belief that the defendants did not need to restrain Hill naked in order to protect their safety and hers. Thus, we affirm the verdict as to the state law privacy claim.

*Id.* at 906.

■ Here, the facts are readily distinguishable from those in *Hill.* The Eighth Circuit Court of Appeals has instructed that "[a]n intrusion occurs when an actor 'believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act.'" *Fletcher,* 220 F.3d at 875 (applying § 652B of the Restatement per Arkansas law) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1083 (3d Cir.1989)) The uncontested record here is that the Sheriff Defendants were exercising their community caretaking functions when they transported Tinius to the hospital and later restrained him in order that a urine sample could be obtained. Thus, the court concludes as a matter of law that the Sheriff Defendants' actions did not constitute an intrusion which would establish an invasion of privacy tort. Moreover, the court finds that the officers' actions here did not rise to the level of "highly offensive" conduct. Unlike the situation in *Hill,* Tinius was not paraded in the nude before members of the opposite sex for no legitimate reason. Rather, nurse Roetman removed Tinius's pants in order to obtain a urine sample from Tinius. This action was necessitated by Tinius's inability or unwillingness to voluntarily provide a urine sample. Furthermore, Tinius was not left exposed like the plaintiff in *Hill.* Instead, nurse Roetman immediately covered Tinius with a blanket after she drew the urine sample. While the catheterization procedure was no doubt an unpleasant one, it is not one

which would permit a jury to conclude that the Sheriff Defendants intruded in a highly offensive manner. Therefore, the court grants summary judgment to the Sheriff Defendants on Tinius's invasion of privacy claim.

### 7. *Negligence*

■ Finally, the Sheriff Defendants seek summary judgment on Tinius's negligence claim. The Sheriff Defendants assert that Tinius cannot establish that the officers breached a duty of care owed to him. Tinius argues that the Sheriff Defendants "breached their duty of care to Plaintiff by restraining him against his will, without probable cause, without a warrant, and without reasonable grounds." Tinius's Br. at 18. To prove his negligence claim against the Sheriff Defendants, Tinius would have to establish that defendants owed him a duty of care, they breached that duty, their breach was the actual and proximate cause of Tinius's injuries, and he suffered damages. *See Virden v. Betts and Beer Constr. Co., Inc.,* 656 N.W.2d 805, 807 (Iowa 2003); *Kolbe v. State of Iowa,* 625 N.W.2d 721, 725 (Iowa 2001); *Novak Heating & Air Conditioning v. Carrier Corp.,* 622 N.W.2d 495, 497 (Iowa 2001); *Walls v. Jacob North Printing Co.,* 618 N.W.2d 282, 285 (Iowa 2000); *Sanford v. Manternach,* 601 N.W.2d 360, 370 (Iowa 1999);*Hartig v. Francois,* 562 N.W.2d 427, 429 (Iowa 1997); *Marcus v. Young,* 538 N.W.2d 285, 288 (Iowa 1995); *accord Donahue v. Washington County,* 641 N.W.2d 848, 850 (Iowa Ct.App.2002).

■ Here, only the second element is at issue—whether the Sheriff Defendants breached a duty of care owed to Tinius. Tinius alleges that the Sheriff Defendants "owed a duty to Plaintiff to protect his constitutional rights in a manner that a reasonably prudent person would." Amended Compl., Count VII. The Iowa

Supreme Court "has often relied on the Restatement (Second) of Torts 'when determining whether a given defendant owes a duty to a plaintiff and the scope of that duty.'" *Van Essen v. McCormick Enter. Co.*, 599 N.W.2d 716, 718 (Iowa 1999) (quoting *Shaw v. Soo Line R.R.*, 463 N.W.2d 51, 55 (Iowa 1990)). Iowa courts have determined that law enforcement officers have a duty of care to protect detainees from personal harm. *See Hildenbrand v. Cox*, 369 N.W.2d 411, 415 (Iowa 1985) ("The Restatement and case law also recognize that persons who take others into their custody, for example peace officers who arrest persons suspected of crime, owe a special duty to aid and protect them."); *Smith v. Miller*, 241 Iowa 625, 628–31, 40 N.W.2d 597, 598–600 (1950) (holding that sheriff owed duty of reasonable care to protect jail inmate from harm). Thus, when an individual is detained or placed in some sort of custody, he is owed a common law duty of care. *See Hildenbrand*, 369 N.W.2d at 415; *Smith*, 241 Iowa at 628–31, 40 N.W.2d at 598–600. Here, the court finds as a matter of law that the Sheriff Defendants did not breach the duty of care they had to plaintiff Tinius. Believing that plaintiff Tinius posed a risk to himself and others, Tinius was taken from the side of the road and transported to St. Anthony Regional Hospital where he was seen by medical personnel. The officers subsequently restrained Tinius in order to obtain a urine sample that was necessary for determination of a proper course of treatment and the appropriate facility for such treatment. Thus, the officers' actions here were taken to protect Tinius from personal harm, which is in keeping with the duty they owed to Tinius. Therefore, the court also grants summary judgment to the Sheriff Defendants on Tinius's negligence claim.

## C. The Hospital Defendants' Motion For Summary Judgment

The Hospital Defendants have also sought summary judgment on each of the five claims against them. The Hospital Defendants assert that Tinius cannot present sufficient evidence and expert testimony to establish a *prima facie* case against them. The Hospital Defendants assert that plaintiff Tinius failed to make timely designation of experts required by Iowa Code § 668.11 and therefore cannot establish the appropriate standard of care to prevail on his claims. Tinius responds that he has not alleged a claim of medical malpractice in this case and therefore the requirements of Iowa Code § 668.11 do not apply in this litigation. Therefore, the court will turn first to a review of the requirements of Iowa Code § 668.11 and then an analysis of its applicability to the claims brought against the Hospital Defendants in this litigation.

### 1. Application of Iowa Code § 668.11

Iowa Code § 668.11 provides:

1. A party in a professional liability case brought against a licensed professional pursuant to this chapter who intends to call an expert witness of their own selection, shall certify to the court and all other parties the expert's name, qualifications and the purpose for calling the expert within the following time period:

a. The plaintiff within one hundred eighty days of the defendant's answer unless the court for good cause not ex parte extends the time of disclosure.

b. The defendant within ninety days of plaintiff's certification.

2. If a party fails to disclose an expert pursuant to subsection 1 or does not make the expert available for discovery, the expert shall be prohibited from testifying in the action unless leave for

the expert's testimony is given by the court for good cause shown.

3. This section does not apply to court appointed experts or to rebuttal experts called with the approval of the court.

IOWA CODE § 668.11.

Iowa appellate courts have held that "[s]ection 668.11 applies to professional liability cases brought against a licensed professional." *Landes v. Women's Christian Ass'n*, 504 N.W.2d 139, 140 (Iowa Ct.App. 1993). The Iowa appellate courts have held that expert testimony is not required where the care received was either non-medical, administrative, ministerial, or routine, or the lack of care was obvious. *See Kastler v. Iowa Methodist Hosp.*, 193 N.W.2d 98, 102 (Iowa 1971) (distinguishing between reasonable care standard which did not require expert testimony and professional liability standard which did); *Bradshaw v. Iowa Methodist Hosp.*, 251 Iowa 375, 384, 101 N.W.2d 167, 172 (1960) (same); *Landes*, 504 N.W.2d at 141 (same). The Iowa Supreme Court has framed the test for determining whether an expert is necessary as follows:

> [I]f all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation, [expert testimony is not required].

*Thompson v. Embassy Rehab. and Care Center*, 604 N.W.2d 643, 646 (Iowa 2000) (citing *Schlader v. Interstate Power Co.*, 591 N.W.2d 10, 14 (Iowa 1999)).

Applying this test, the essentially undisputed primary facts here are, indeed, of common understanding. Tinius was found walking down a rural road in January without proper clothing. By his own admission, he was depressed. Tinius was perceived to be in a disoriented state and initially refused to provide his name to the deputy. He was taken to the emergency room of St. Anthony Regional Hospital where he was seen by Dr. McCoy. Dr. McCoy suspected substance abuse as a possible cause for Tinius's condition. To determine the proper course of treatment for Tinius, a medical screening for intoxicants was necessary. St. Anthony Regional Hospital is only able to emergently determine intoxicants through urine analysis. Although St. Anthony Regional Hospital personnel requested that Tinius provide a urine sample, he was unable or unwilling to provide one. In order to obtain a urine sample, a catheter was used to obtain a urine sample for analysis. Once the results of that testing were positive for amphetamine, marijuana and cannaboids, Tinius was transported to Cherokee Mental Health Institute as St. Anthony Regional Hospital lacked the appropriate facilities to care for him.

■ Under Iowa law, a medical battery claim is appropriate only in circumstances when a doctor performs a procedure to which the patient has not consented. *See Moser v. Stallings*, 387 N.W.2d 599, 601 (Iowa 1986); *Cowman v. Hornaday*, 329 N.W.2d 422, 424 (Iowa 1983); *Perin v. Hayne*, 210 N.W.2d 609, 618 (Iowa 1973); *see also Morgan v. Olds*, 417 N.W.2d 232, 235 (Iowa Ct.App.1987). The duty to obtain a patient's informed consent arises out of the patient's right, absent extenuating circumstances, to exercise control over his or her body by making an informed decision concerning the course of medical treatment. *See Pauscher v. Iowa Methodist Med. Ctr.*, 408 N.W.2d 355, 357 (Iowa 1987); *Cowman*, 329 N.W.2d at 424–25; *see also Morgan*, 417 N.W.2d at 235. The Iowa Supreme

Court has noted a number of situations that constitute exceptions to the duty to obtain informed consent, including " '[s]ituations in which an emergency makes it impractical to obtain consent.' " *Pauscher*, 408 N.W.2d at 357 (quoting *Cowman*, 329 N.W.2d at 426). Thus, under Iowa law, absent an emergency situation, Tinius's informed consent was a prerequisite for conducting a medical procedure upon him. Plaintiff Tinius contends that he was not suffering from an emergency medical condition when he was brought to the hospital. As evidence of this, he points to the fact that Dr. McCoy judged him to be "medically stable" at the time the decision was made to obtain a urine sample from him by use of a catheter. The court finds that the claim of lack of consent here is not an issue beyond the common knowledge of laypersons such as to require expert evidence. Although expert testimony may be required to establish the emergency exception to informed consent, that burden would lie with the Hospital Defendants and not plaintiff Tinius. As expert testimony is not required to establish Tinius's *prima facie* case, plaintiff Tinius's failure to designate an expert does not warrant granting of the Hospital Defendants' Motion For Summary Judgment. Therefore, this portion of the Hospital Defendants' Motion For Summary Judgment is denied.

### 2. Applicability of EMTALA

The Hospital Defendants further argue that they were required under the federal Emergency Medical Treatment and Active Labor Act ("EMTALA") to provide a medical screening examination to Tinius to ascertain whether he had an emergency medical condition. The Hospital Defendants contend that they are entitled to summary judgment because of the absence of any expert testimony to show that the medical procedure complained of was inappropriate as part of the medical screening examination provided to Tinius. Plaintiff

Tinius responds that because he never requested medical treatment from the Hospital Defendants, and did not consent to the treatment he was given, the Hospital Defendants are not protected by the terms of EMTALA. Plaintiff Tinius also contends that if EMTALA is applicable here, that the Hospital Defendants failed to raise it as an affirmative defense and are therefore barred from relying on it here.

### a. The terms of EMTALA

In 1986, EMTALA was enacted "in response to a growing concern that hospitals were 'dumping' patients unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized." *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 710 (4th Cir.1993); *see Harry v. Marchant*, 291 F.3d 767, 768 (11th Cir.2002); *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir.1999); *Bryan v. Rectors and Visitors of the Univ. of Virginia*, 95 F.3d 349, 351 (4th Cir.1996). Under EMTALA, hospital emergency rooms are subject to two principal obligations, commonly referred to as the appropriate medical screening requirement and the stabilization requirement. *See* 42 U.S.C. § 1395dd. Regarding the appropriate medical screening requirement, the EMTALA statute provides, in pertinent part:

(a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, in-

cluding ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists. 42 U.S.C. § 1395dd(a). The statute defines, in pertinent part an "emergency medical condition" as:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part...

42 U.S.C. § 1395dd(e)(1)(A).

Thus, EMTALA requires that a participating hospital provide "an appropriate medical screening examination" to all who come to its emergency room seeking medical assistance. 42 U.S.C. § 1395dd(a). The statute does not define that phrase except to state that the purpose of the examination is to determine whether an "emergency medical condition" exists.

### b. Applicability of statute

Here it is uncontested that Tinius never requested treatment at the hospital. Moreover, the Hospital Defendants have not demonstrated that the deputy sheriffs who brought Tinius to the hospital had the authority to act in his behalf to request an examination of him for a medical condition. Thus, the applicability of EMTALA to the examination performed on Tinius has not been demonstrated here. More importantly, there has been absolutely no showing here that EMTALA in anyway preempts state law on the requirement of informed consent to medical procedures. EMTALA was not intended to create a new federal cause of action for medical malpractice. See *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir.1996) (*en banc*) ("So far as we can tell, every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms."); *see also St. Anthony Hosp. v. United States Dep't of Health and Human Servs.*, 309 F.3d 680, 694 (10th Cir.2002); *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir.2002); *Bryant v. Adventist Health Sys.*, 289 F.3d 1162, 1166 (9th Cir.2002); *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir.2000); *Bryan v. Rectors & Visitors of the Univ. of Va.*, 95 F.3d 349, 351 (4th Cir.1996); *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (10th Cir.1994); *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.1994). Rather, EMTALA and state tort laws provide distinct remedies for different wrongs. *See Bryant*, 289 F.3d at 1166; *Abercrombie v. Osteopathic Hosp. Founders Ass'n*, 950 F.2d 676, 681 (10th Cir.1991); *Stevison v. Enid Health Sys., Inc.*, 920 F.2d 710, 713 (10th Cir.1990); *Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1133 (6th Cir.1990). Thus, Tinius's claim of lack of consent is not controlled by EMTALA but rather by Iowa state law. As was mentioned above, under Iowa law, absent an emergency situation, Tinius's informed consent was a prerequisite for conducting a medical procedure upon him. The Hospital Defendants have not established, as a matter of law, the existence of an emergency situation such that would obviate the need for obtaining Tinius's consent before catheterizing him. Therefore, this portion of the Hospital Defendants' Motion For Summary Judgment is also denied.

## III. CONCLUSION

Initially, the court concludes that because the Sheriff Defendants' actions in stopping Tinius, transporting him to the hospital, and in assisting in the involuntary catheterization unquestionably involve a seizure within the meaning of the Fourth Amendment, Tinius's allegations cannot support a substantive due process claim because such claims are covered by the Fourth Amendment and must be analyzed under the reasonableness standard governing searches and seizures under the Fourth Amendment. Therefore, the court grants the Sheriff Defendants' Motion For Summary Judgment with respect to Count I. The court next concludes that the Sheriff Defendants did not violate Tinius's Fourth Amendment rights because they were justified in their actions under the officers' "community caretaking" function. Alternatively, the court concludes that the Sheriff Defendants are entitled to qualified immunity with respect to those claims contained in Count II. Therefore, the court grants the Sheriff Defendants' Motion For Summary Judgment with respect to Count II. Because the court has concluded that the Sheriff Defendants were engaged in their community caretaking functions when they detained Tinius and their detention was not unlawful, the court finds that the Sheriff Defendants are entitled to judgment as a matter of law on Tinius's false imprisonment claim. Therefore, the Sheriff Defendants' Motion For Summary Judgment is granted as to Count III. The court further finds that because the Sheriff Defendants were properly performing their "community caretaking" function when they detained Tinius and later restrained him during the catheterization procedure, no question of material fact has been generated that the deputies acted with the intent to cause Tinius physical pain. Therefore, the Sheriff Defendants' Motion For Summary Judgment is also granted as to Tinius's claims of assault and battery contained in Count IV. Next, the court concludes, as a matter of law, that with respect to plaintiff Tinius's claim for intentional infliction of emotional distress, that Tinius cannot establish that the Sheriff Defendants' conduct was extreme and outrageous. Therefore, the Sheriff Defendants' Motion For Summary Judgment is also granted as to Count V. The court further concludes that the Sheriff Defendants' actions here did not rise to the level of "highly offensive" conduct such that would support Tinius's claim for invasion of privacy. Therefore, the court grants summary judgment to the Sheriff Defendants on Tinius's invasion of privacy claim contained in Count VI. The court also finds that the Sheriff Defendants did not breach a duty of care owed to Tinius. Thus, the Sheriff Defendants' Motion For Summary Judgment is also granted as to Tinius's negligence claim contained in Count VII. Therefore, the Sheriff Defendants' Motion For Summary Judgment is **granted as to all claims**. Finally, with respect to the Hospital Defendants' Motion For Summary Judgment, the court concludes that Tinius can present sufficient evidence to establish a *prima facie* case against them. Moreover, the court finds that Tinius's claim of lack of consent is not controlled by EMTALA but rather by Iowa state law, and the Hospital Defendants have not established, as a matter of law, the existence of an emergency situation such that would obviate the need for obtaining Tinius's consent before catheterizing him. Therefore, the Hospital Defendants' Motion For Summary Judgment is **denied**.

**IT IS SO ORDERED.**